UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-62499-CIV-STRAUSS

DM YACHTS,

     Plaintiff,

v.

DENISON YACHT SALES, INC,

     Defendant.

_____/

## ORDER DENYING DEFENDANT DENISON YACHT SALES, INC.'S MOTION FOR SUMMARY JUDGMENT

     **THIS CAUSE** has come before the Court upon Defendant Denison Yacht Sales, Inc.'s

Motion for Summary Judgement and Incorporated Memorandum of Law ("Motion").  (DE 101).

The Court has reviewed the Motion (DE 101), the response (DE 105), the reply (DE 111), and

other pertinent parts of the record and heard oral argument on the Motion on April 28, 2020.  For

the reasons stated below, the Court hereby **DENIES** the Motion.

    **I.**    **FACTS**[1]

     Plaintiff DM Yachts ("Plaintiff" or "DM") seeks to recover what it believes is its rightful

portion of a commission stemming from the sale of a yacht, the M/Y INVADER ("Invader"), to

Ioannis Iossifidis ("Buyer").  In July 2017, Defendant Denison Yacht Sales, Inc. ("Defendant" or

"DYS") entered into a listing agreement with the seller of the Invader to broker the Invader's sale.

(DE 102 at ¶3; DE 102-2 at 7:1-19).  On August 12, 2017, Ken Denison ("K. Denison"), one of

---

[1] Within this section, the Court notes where the parties dispute certain facts.  However, in reviewing the motion for summary judgment, the Court views the evidence, and all factual inferences drawn therefrom, in the light most favorable to the non-moving party (here, Plaintiff).

Defendant's employees, sent an email announcement to other brokers announcing the Invader's availability for purchase.  (DE 102 at ¶¶6-7; 102-2 at 15:6-11).  K. Denison sent another email announcement on September 29, 2017, which included the asking price, location, photographs, and a video of the Invader.  (DE 102 at ¶¶8-9; DE 102-2 at 13:16-15:11; DE 106 at ¶¶8-9).

Plaintiff is a Greek business engaged in yacht brokering and other yacht-related services.  (DE 106 at ¶10).  Dimitris Molfesis ("Molfesis") is the sole owner of, and one of only two direct employees of, Plaintiff.   (DE 102 at ¶11; DE 106 at ¶11).  On September 29, 2017, Molfesis learned from K. Denison's email that the Invader was available for purchase.  (DE 102 at ¶12; DE 106 at ¶12).  The same day, Molfesis contacted K. Denison by telephone seeking more information about the Invader.  (DE 102 at ¶¶13-14; DE 106 at ¶¶13-14).  During the call, Molfesis introduced himself to K. Denison.  On October 1, 2017, Molfesis sent a follow-up email to K. Denison requesting a "broker friendly" brochure for the Invader, seeking information about the Invader's engines, generators and location, and indicating, "I have a client and could probably will be interesting[.]".   (DE 102 at ¶16; DE 106 at ¶16).  On October 2, 2017, K. Denison responded to Molfesis by email, sending Molfesis a broker friendly brochure,[2] providing a statement about the state of the Invader's engines and generators, and indicating the Invader's location.  (DE 102 at ¶18; DE 106 at ¶18).  Molfesis and K. Denison exchanged another pair of emails that day regarding when Molfesis could call K. Denison.  (DE 102 at ¶¶19-20; DE 106 at ¶¶19-20).

Alekos Sidiropoulos ("Sidiropoulos") is a Greek naval architect who is involved with various aspects of yacht services, including brokerage.  (DE 102-4 at 14:11-15:7; 19:1-16).  Sidiropoulos and DM have a Cooperation Agreement wherein they agree to cooperate regarding

---

[2] A "broker friendly" brochure does not provide contact information for the listing broker in order to prevent the potential buyer from cutting out his own broker by going directly to the listing broker.  (DE 106 at ¶84).

various activities, including the sale of second-hand yachts.  (DE 102-3, Ex. 7; DE 106 at ¶34).

Under the agreement, Sidiropoulos (who is styled in the agreement as "the Introducer") will

introduce to DM "any potential clients (buyers and/or sellers) who are interested of [sic] selling

their yachts or purchase of any Yacht which is within the portfolio of DM YACHTS or which will

be traced in the future by DM YACHTS and will be included in its portfolio in due course."  (DE

102-3, Ex. 7).  The agreement further contemplates that Sidiropoulos and DM will split the

commission from any successful sale or purchase by a client introduced to DM by Sidiropoulos.

*Id*.

      In April 2017, Sidiropoulos met with Buyer to discuss construction of a new 50-meter

yacht.  (DE 102-4, Ex. 14; 39:13-16).  Sidiropoulos estimates that he met with Buyer

approximately six times over the course of six months regarding the potential construction of a

new yacht (*Id*. at 93:21-94:3), although Buyer testified that he had only met Sidiropoulos once, in

September 2016.  (DE 102-5 at 21:11-20, 39:3-8).  According to Sidiropoulos, in September 2017

Buyer told Sidiropoulos that Buyer was no longer interested in building a new yacht and would

prefer to purchase a second-hand yacht.  (DE 102-4 at 51:25-52:20).  Sidiropoulos asked Buyer,

"Can I help you on this?" and Buyer responded, "My pleasure."  (*Id*. at 52:22-23).  Buyer told

Sidiropoulos that he was looking for a yacht made of steel, approximately 45 to 52 meters, for

under 12 million dollars.  (*Id*. at 53:25-54:17).  According to Sidiropoulos, Sidiropoulos had asked

if he could help Buyer, and Buyer had said "yes," although Sidiropoulos and Buyer did not enter

into any formal agreement.  (*Id*. at 52:24-53:9, 54:24-55:2).[3]

---

[3] In a written "Declaration," Sidiropoulos asserts that, following his meeting with Buyer in April
2017, he "continued to have contact with Giannis Iosifidis as to other yacht buildings which might
be of interest to him or alternatively in finding a suitable yacht for his purchase."  (DE 102-4, Ex.
14, ¶4).  However, the above-cited deposition testimony is the only specific evidence of the
creation and contours of an understanding between Buyer and Sidiropoulos that Sidiropoulos

Sidiropoulos contacted Molfesis and two other yacht brokers and asked whether they had any yachts meeting the specifications described by Buyer – 45-50 meters and made of steel or aluminum. (*Id*. at 55:3-25). Molfesis provided Sidiropoulos information about the Invader by telephone. (DE 102-4 at 55:15-20, 56:13-23, 60:3-5). On October 5, 2017, Sidiropoulos sent a text message to Buyer's cellular telephone number stating, "Codecasa 49m 1999, one owner since new, used as private never was charter, 6 cabins, light interior elevator up to the 3rd deck. Perfect condition. Rgds Alex Sidiropoulos." (DE 102-4 at Ex. 14, 69:20-70:4). Buyer did not respond to this text message. (*Id*. at 70:7-14). On October 5, 2017, Molfesis sent an email to K. Denison stating, in part, "We offered the INVADER to the client Mr. Giannis Iosifidis and I will update you in the next two days, he is a cash buyer he sold his 38m four months ago." (DE 106, ¶21). Defendant had no contact with Buyer prior to this date. (DE 106, ¶94).

On October 6, 2017, Molfesis sent an email to Sidiropoulos, with the broker friendly e-brochure of the Invader attached. (DE 106, ¶37). Sidiropoulos forwarded this email to info@kafea.gr. (DE 106 at ¶40; DE 102-4, Ex. 11). Sidiropoulos's message stated, "Dear Giannis[,] Please find attached the e brochure, specs of Codecasa 49m 1999 Invader, that I send you yesterday via SMS at your mobile phone. Kind regards[,] Alekos." (DE 102-4, Ex. 11). Email address info@kafea.gr is a central email for one of Buyer's businesses. (DE 102-5 at 45:12-20). Buyer does not have a personal email address. (*Id*. at 46:5-6). If an email is sent to Buyer at that address, it is forwarded to Buyer's secretary. (*Id*. at 45:21-46:6). Buyer's secretary prints

---

would assist Buyer in finding and purchasing a second-hand yacht. Buyer denies having any agreement with Sidiropoulos in connection with his purchase of the Invader. (DE 102-5 at 21:25-22:6). Other than the agreement described by Sidiropoulos, Buyer also did not have any agreement with Molfesis or Plaintiff, and Plaintiff only had contact with Buyer through Sidiropoulos. (DE 106, ¶¶36, 61). Plaintiff has not indicated evidence that Sidiropoulos presented himself to Buyer as a representative or agent of Plaintiff. *See* DE 106.

everything addressed to Buyer and gives it to him. (*Id*. at 46:7-47:3). Buyer did not respond to Sidiropoulos's email or otherwise acknowledge to Sidiropoulos that he had received it. (DE 102-4 at 62:15-20). Sidiropoulos attempted to contact Buyer by telephone multiple times, but Buyer did not answer the calls. (*Id*. at 71:11-24, 83:9-12).

Buyer contacted K. Denison in mid-November 2017, first by telephone and then by email to express interest in buying the Invader. (DE 106 at ¶96; DE 102-2 at 31:9-35:17). In December 2017, Buyer entered into a contract to purchase the Invader. (DE 102 at ¶46; DE 106 at ¶46). Plaintiff did not have any contact with Defendant between October 5, 2017 and January 9, 2018, when Molfesis learned of Buyer's contract to purchase the Invader. (DE 106 at ¶25).

Buyer claims that he learned of the Invader from his son, who showed him pictures and information about the Invader on the Internet. (DE 102-6 at ¶3; DE 102-5 at 10:24-12:2). In his deposition, Buyer stated that his son showed him the information "after Easter," and in his "Declaration," Buyer stated that it was "several weeks before the 2017 Monaco Boat Show," which occurred from September 28 – October 1, 2017. *Id*. At the time, Buyer was not interested in the Invader because he thought it was larger and older than what he was looking for. (DE 102-6 at ¶3). Buyer denied having any contact with Sidiropoulos about the Invader, including any text or email messages. (DE 102-5 at 30:25-31:14; 32:11-17).

## II.   <u>LEGAL STANDARD</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at 322-23). *See also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)). Provided that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Hornsby-Culpepper*, 906 F.3d at 1311-12.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242). Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117

F.3d 1278, 1285 (11th Cir. 1997) (citation omitted).  Moreover, all reasonable doubts regarding

the facts must be resolved in favor of the non-moving party.  *Rioux v. City of Atlanta, Ga.*, 520

F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

### III.   <u>ANALYSIS</u>

Plaintiff premises its claim to a share of the commission on the sale of the Invader on three

alternative theories, articulated in three separate counts: breach of implied contract (Count 1),

quantum meruit (Count 2), and unjust enrichment (Count 3).  However, the ultimate issue as to all

three theories is whether Plaintiff was the "procuring cause" of the sale of the Invader to Buyer.

*See* DE 17.  *See also Merle Wood & Associates, Inc. v. Trinity Yachts, LLC*, 857 F. Supp. 2d 1294,

1305-1306 (S.D. Fla. 2012).  In order to earn a commission as the "procuring cause,"

> a broker must perform two essential tasks: First, the broker must "initiate[ ]
> negotiations by doing some affirmative act to bring buyer and seller together."
> Second, the broker must remain "involved in the continuing negotiations between
> the seller and the buyer," unless "the seller and buyer intentionally exclude the
> broker from the negotiations."

*Rotemi Realty Inc. v. Act Realty Co. Inc.*, 911 So. 2d 1181, 1189 (Fla. 2015) (internal citations

omitted).  Courts have observed that while this standard is well-established in Florida law, its

application to a given set of facts can be difficult.  *See id.* (citing *Osheroff v. Rauch Weaver*

*Millsaps & Co.,* 882 So. 2d 503, 505 (Fla. 4th DCA 2004)).

Whether a broker has performed the tasks necessary to be considered the procuring cause

"is a question of fact that the [fact-finder] must determine from the surrounding circumstances."

*Id*. (internal citations omitted).  Simply because this is a question of fact for the fact-finder based

on the surrounding circumstances does not, as Plaintiff argues, mean it is ineligible for summary

judgment.  *See*, *e.g.*, *Edwards v. Brandon Realty, Inc.*, 497 So. 2d 269 (Fla. 2d DCA 1986)

(reversing entry of summary judgment for brokers and directing trial court to enter summary

judgment for buyers and sellers).  However, the question is so fact-specific that it can be difficult to draw concrete lessons from prior cases applying the same general standard.

The "affirmative acts" that Plaintiff[4] undertook to allegedly bring buyer and seller together are: (1) obtaining a broker-friendly brochure from Defendant; (2) sending one text message with brief information about the (unnamed) Invader and one email attaching the Invader's broker-friendly brochure to Buyer; and (3) sending an email to Defendant that Plaintiff had "offered" the Invader to "client" "Giannis Iosifidis."  As discussed more fully below, the Court finds that there is a genuine dispute of fact as to whether Plaintiff's actions were the "spark" that brought the Invader to Buyer's attention or prompted him to initiate negotiations with Defendant and whether Buyer and Defendant intentionally excluded Plaintiff from further participating in those negotiations.  The more difficult question, as also discussed below, is whether, even resolving these factual disputes in favor of Plaintiff, Plaintiff's acts were sufficient under Florida law for the Plaintiff to be considered the "procuring cause."

A.  Disputes of Fact

Defendant primarily relies on what it asserts are three "undisputed" facts demonstrating that Plaintiff cannot prove it initiated the negotiations between Buyer and Defendant: (1) Plaintiff and Buyer had "no relationship" prior to the "unsolicited" text and email from Sidiropoulos to Buyer; (2) Buyer did not receive the "unsolicited" text and email from Sidiropoulos; and (3) Buyer learned of the Invader from his son, not Sidiropoulos or Plaintiff.  However, the Court finds that

---

[4] A central premise of Plaintiff's case is that the Cooperation Agreement between Plaintiff and Sidiropoulos renders Sidiropoulos an agent of Plaintiff, such that Sidiropoulos's actions may be imputed to Plaintiff.  At the hearing on Defendant's Motion, Defendant's counsel appeared to concede, at least for summary judgment purposes, that Sidiropoulos and Plaintiff had an agency relationship.

Plaintiff has put forth sufficient evidence to at least create a genuine dispute as to each of these facts.

First, there is a dispute about the relationship between Buyer and Plaintiff – or, more specifically, Buyer and Sidiropoulos.  While Buyer insists that he had no agreement with Sidiropoulos about Sidiropoulos assisting Buyer in finding a second-hand yacht (DE 102-5 at 21:25-22:6), Sidiropoulos says otherwise.  Sidiropoulos's description in his deposition testimony about the conversation that led to this understanding is brief and potentially open to interpretation. (DE 102-4 at 51:25-55:2).  However, the fact that Sidiropoulos sought out a second-hand yacht meeting Buyer's expressed criteria (in terms of size, material, and price) lends some credence to idea that the two men at least discussed Buyer's search for a second-hand yacht.  Whose description of that conversation, and its import, is more accurate is a question of credibility for a jury to decide.  Taking the evidence in the light most favorable to Plaintiff, the Court must credit Sidiropoulos's testimony that Buyer had accepted his help in finding a second-hand yacht.

Second, Defendant insists that Plaintiff has no evidence to dispute Buyer's assertion that Buyer never received Sidiropoulos's text and email about the Invader.[5]  Thus, Defendant argues that Plaintiff cannot show that Buyer learned of the Invader through Plaintiff.  However, these facts are, again, matters of credibility.  It is undisputed that Sidiropoulos sent the text message to Buyer's correct cell phone number.  Absent evidence that the message did not properly transmit, a jury could infer from ordinary experience that the message would have been delivered to Buyer's

---

[5] The Court notes that the email containing the broker-friendly brochure is more significant than the text message.  The text message contained some basic information about the Invader, but it did not provider the vessel's name or any other identifying information from which Buyer could have discerned the seller or seller's agent.  At best, the text message may have primed Buyer to expect further information from Sidiropoulos.  The email, however, by providing the vessel's name and other more specific information, may have enabled Buyer to further search for the selling broker's (Defendant's) identity and contact information.

phone.  It is similarly undisputed that the email was sent to the address of Buyer's company, and that, in the ordinary course of company operations, such an email addressed to Buyer would have been routed to his secretary and delivered to Buyer.  (DE 102-5 at 45:12-47:3).  Indeed, at his deposition, Buyer stated that his secretary gives him "everything which is addressed to me or to – to my office." *Id*. at 47:2-3.  Defendant has presented no evidence to prove that the ordinary course of events did not occur here beyond Buyer's general assertion that he received no such email. Therefore, circumstantial evidence suggests that Buyer would have received this email, and a jury could choose to credit this evidence over Buyer's testimony.  Whether Buyer genuinely did not receive or pay any attention to these messages is a matter of credibility that a jury must assess. Moreover, this question of credibility is connected to the factual question of Sidiropoulos and Buyer's relationship discussed above.  A jury may be more inclined to believe that Buyer ignored Sidiropoulos's messages if they were genuinely "unsolicited" messages from an unknown or unexpected source.  However, if a jury were to credit Sidiropoulos's testimony that Buyer had agreed to accept his help in finding a second-hand yacht a few weeks before these messages were sent, it may be less inclined to believe that Buyer actually ignored them.  Therefore, there is a genuine issue of fact as to whether Buyer received information about the Invader from Plaintiff.

Third, Defendant contends that Plaintiff cannot counter Buyer's undisputed testimony that he learned of the Invader through his son, who found it on the Internet.  However, this testimony is insufficient to require summary judgment for two reasons.  First, given the plausible alternative explanation outlined above that Buyer learned of the Invader through Sidiropoulos, combined with the fact that Buyer contacted Defendant within about six weeks of receiving those messages, the truth of Buyer's assertion that he actually (and only) learned of the Invader through his son depends on a jury's assessment of his credibility.  The fact that Buyer has given two different estimates of

when his son told him about the Invader further demonstrates the need for a credibility determination.[6]  *Compare* DE 102-6, ¶3 *with* DE 102-5 at 10:24-12:2.  Furthermore, Buyer stated in his Declaration that, when his son showed him the Invader, he was not interested because he thought it was larger and older than what he was looking for.  (DE 102-6, ¶3).  This statement raises the possibility that Plaintiff was the procuring cause even accepting as true Buyer's statement that he first learned of the Invader through his son.  If Buyer was not interested in the Invader when his son initially showed it to him, something must have caused Buyer to reconsider the Invader between then and mid-November 2017.  Neither Buyer's deposition nor other record evidence put forward explain what caused Buyer to change his mind about the Invader.  During his deposition, Buyer merely testified that, at some unspecified time, he asked his son to find the boat again on the Internet.  (DE 102-5 at 36:6-37:14).  Indeed, the only events described in the record between mid-late September 2017 (the later estimate Buyer gave for when his son showed him the Invader) and mid-November (when Buyer contacted Defendant), were Sidiropoulos's attempts to contact Buyer about the Invader.  If Sidiropoulos's messages were the impetus for Buyer's reconsideration, it is possible that Plaintiff could be found to be the procuring cause.  *Cf. Edwards* 497 So. 2d  at 272 (suggesting that "if anyone was the procuring cause," it was a friend who reintroduced buyers to a property they had previously rejected).

---

[6] While Buyer's two estimates ("after Easter" and "several weeks before [September 28 – October 1, 2017]" do not technically conflict, the span of time between Easter and the end of September is sufficiently large to raise some question of credibility, particularly when it is undisputed that the Invader was not advertised until August 12, 2017.  A jury could easily dismiss this disparity as an innocent lapse of memory or consider it a more significant indication of incredibility.  The point, however, is that this is a jury's assessment to make.

B.  Sufficient Affirmative Acts

Assuming that Buyer had an arrangement with Sidiropoulos enlisting Sidiropoulos's assistance in finding a second-hand yacht and received Sidiropoulos's text and email messages, the question becomes whether these acts (combined with Plaintiff's email to Defendant indicating it had "offered" the Invader to "the client Mr. Giannis Iosifidis") sufficiently initiated negotiations by bringing buyer and seller together.  Defendant argues that no case has ever found such minimal effort to warrant such a finding.  Plaintiff argues that if its actions sparked the interest that ultimately led Buyer to negotiate for, and purchase, the Invader, then it is the procuring cause (at least where Buyer's decision to cut Plaintiff out of further negotiations prevented Plaintiff from having any further involvement, as Plaintiff contends).

The language of the procuring cause standard allows for a broad range of behavior.  The broker (at least initially) need only "initiate[ ] negotiations by doing **some affirmative act** to bring buyer and seller together."  *Rotemi Realty Inc.*, 911 So. 2d at 1189 (emphasis added).  Read literally, this standard indicates that even a small act, if it causes the buyer and seller to begin negotiating, is sufficient (assuming the broker either remains engaged or is subsequently intentionally excluded).  Defendant argues, however, that the actual facts from the cases applying this standard show that brokers whom courts have deemed the "procuring cause" actually engaged in more robust activity than Plaintiff performed here.  Thus, Defendant suggests that case law defines a minimum amount of action required to satisfy the standard and that Defendant's actions fall below that"floor."

It is clear that, even in the light most favorable to Plaintiff, Plaintiff's involvement in this transaction was significantly more limited than that of brokers who were deemed the "procuring cause" in other cases cited by the parties. *See*, *e.g.*, *Rotemi Realty Inc.*, 911 So. 2d at 1183 (brokers

entered into agreement with sellers, faxed letter to buyers to initiate negotiation of sale, and spoke repeatedly with buyer and appraisers); *Fearick v. Smuggler's Cove Inc.*, 379 So. 2d 400 (Fla. 2d DCA 1980) (broker had multiple meetings with buyer); *Nat'l Airlines, Inc. v. Oscar E. Dooly Assocs., Inc.*, 160 So. 2d 53  (Fla. 3d DCA 1964) (broker called buyer's attention to property, obtained a price quote from seller, and corresponded with both buyer and seller, even though he did not physically introduce them).  However, Defendant provides no case law indicating where the "floor" is.  In the examples provided where a broker's claim to be the "procuring cause" was rejected, the rejection was based on evidence of some intervening factor or extenuating circumstance that showed that the broker's actions did not have the claimed effect, rather than the broker's actions simply having been too minimal.

There is case support for Plaintiff's contention that simply being the "spark" initiating Buyer's interest, with little more affirmative action, is sufficient to be the procuring cause where, as Plaintiff contends, the parties intentionally excluded the broker thereafter.  For example, in *Alcott v. Wagner & Becker, Inc*., 328 So. 2d 549 (Fla. 4th DCA 1976), a purchaser's agent saw the plaintiff-broker's advertisement about a property for sale.  The agent contacted the broker and learned the identity of the seller, after which the agent contacted the seller directly and negotiated a sale.  *Id*. at 550.  Despite the fact that the plaintiff-broker did nothing to initiate negotiations beyond bringing the property to the eventual-buyer's attention with an advertisement, the court found that the plaintiff had established a *prima facie* case.  *Id*. at 551.  Similarly, *South Pacific Enterprises v. Cornerstone Realty, Inc.*, 672 So. 2d 568, 570 (Fla. 4th DCA 1996) describes how a broker was the procuring cause when the buyer's "interest in the property, the genesis for all subsequent dealings including the ultimate sale of the property, resulted from" the broker's initial showing of the property.

Defendant argues that *Alcott* is distinguishable because the plaintiff-broker there had an exclusive agreement with the seller promising to pay the broker a fixed amount for procuring a buyer.  By contrast, Defendant claims Plaintiff here had no prior agreement with either party. However, this claim requires resolving the factual dispute over the agreement between Sidiropoulos and Buyer (or lack thereof), described above, in Defendant's favor.  Similarly, Defendant argues that *South Pacific* is inapplicable because Plaintiff (including Sidiropoulos) did not play the same "pivotal role in generating interest" as the broker played in that case, pointing specifically to the facts that neither of them spoke directly to Buyer about the Invader nor toured the vessel with him.  (DE 111 at 5).  Yet, given the Court's conclusion that there is a genuine dispute about whether Sidiropoulos's messages either first informed Buyer about the Invader or turned his attention back to the Invader after his initial lack of interest in it, it is impossible to definitively conclude that Plaintiff did not play a "pivotal role in generating interest."

Defendant also relies on *Edwards* to represent the idea that an "isolated showing" of a property is insufficient for a broker to be considered the "procuring cause."  *See* DE 101 at 6. However, read closely, the *Edwards* decision relied less on the number of showings or other activity performed by the suing broker and more on the undisputed evidence that the sale was precipitated by an independent, intervening cause (a happenstance reintroduction to the property and its owners by a third-party several months after the buyers had rejected the property).  497 So. 2d at 272.  Thus, in *Edwards* the facts much more clearly demonstrated both that an intervening cause (and not the suing broker) had brought the buyers and seller together and, by the same token, that the buyers and seller had not intentionally cut the original broker out of negotiations (since there was no attempt to engage in negotiations until that intervening cause occurred, long after the last contact with the suing broker).

14

At oral argument, Defendant argued that finding Plaintiff's actions sufficient to be the "procuring cause" would allow a broker to recover a commission for merely putting an unsolicited flyer in a prospective buyer's mailbox.  Clearly such activity is insufficient to make the broker the "procuring cause."  *See Earnest & Stewart, Inc. v. Codina,* 732 So. 2d 364, 366 (Fla. 3d DCA 1999) ("The present situation is very like a hypothetical one in which a broker merely tells a customer that he has seen a "For Sale" sign in front of a particular piece of property. Surely there could be no claim for compensation under those indistinguishable circumstances.").  The facts of *Earnest & Stewart* are quite analogous to Defendant's version of events here.  In *Earnest & Stewart,* the suing broker told a couple, with whom it had had prior dealings, that a particular property was for sale, after the broker had learned about the property at a real estate meeting.  *Id.* at 365.  The couple rejected the broker's offer to show them the home or to otherwise have the broker participate in the prospective purchase because the couple was already familiar with the sellers and the sellers' property.  *Id.*  Thus, the couple chose to deal directly with the sellers themselves and ultimately purchased the home without the broker's (unwelcomed, unnecessary, and specifically rejected) assistance.  *Id.*  The court found that "the sole and simple act of telling the eventual purchasers that the piece of property was for sale" could not make the broker the "procuring cause."  *Id.* at 365-366.  However, the disputed issues of fact described above create potential key distinctions between the facts in *Earnest & Stewart* and the facts here.  As described above, a jury could determine that, unlike in *Earnest & Stewart* (or Defendant's flyer hypothetical), Buyer here affirmatively accepted Sidiropoulos's offer of assistance.  Or, unlike in *Earnest & Stewart*, a jury could find that Buyer was not already familiar with (or interested in) the Invader prior to Sidiropoulos's text and email.  In other words, while this case may ultimately be precisely

analogous to *Earnest & Stewart*, it requires a fact-finder to determine key facts that would make it so.

Additionally, particularly at this stage, the Court must consider the possibility that Plaintiff's involvement was so truncated because Buyer chose to ignore its further entreaties and cut Plaintiff out of further dealings so early on, after having accepted the initial idea of buying the Invader from Plaintiff.  In order to excuse the fact that it did not remain actively engaged in the negotiations between Buyer and Defendant, Plaintiff must show that both Buyer and Defendant purposefully excluded Plaintiff, even if they did not do so clandestinely or maliciously.  *Sheldon Greene & Assocs., Inc. v. Rosinda Invest., N.V.,* 475 So. 2d 925, 928 (Fla. 3d DCA 1985).

Defendant argues that this case is analogous to *Lee Giusti Realty, Inc. v. L.D. Corp.*, 603 So. 2d 39 (Fla. 4th DCA 1992).  There, the buyer testified that he had no dealings with the suing broker and found the property through means completely independent of the broker, apparently unaware that the broker had previously shown the property to the buyer's business partner.  *Id*. at 40.  The seller testified that the buyer told him the broker was uninvolved.  *Id*.  But, significantly, the *Lee Giusti* decision followed a trial, after which the appellate court was required to review the facts in the light most favorable to the prevailing defendants (*id*.), whereas the opposite standard applies here.

Again, it is for a jury to decide whether Buyer was oblivious to Sidiropoulos's communications about the Invader, found them unhelpful because they simply duplicated what he already knew, or intentionally decided to act on that information while ignoring Sidiropoulos's follow-up calls and cutting him out of any further dealings.  Similarly, while Plaintiff's single mention of Buyer's name in his October 5, 2017, email to Defendant may or may not have caused Defendant to recognize Buyer when he called Defendant directly six weeks later, the jury is entitled

to make that inference (as Defendant's counsel conceded at oral argument) and infer that Defendant nevertheless chose to proceed in spite of that recognition.[7]

## IV.   **CONCLUSION**

For the foregoing reasons, the Court concludes that there are genuine issues of material fact that preclude summary judgment.  It is therefore

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (DE 101) is **DENIED**.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 13th day of July 2020.

Jared M. Strauss
United States Magistrate Judge

Copies furnished to counsel via CM/ECF

---

[7] As stated in *Lee Guisti*, both parties must know of a broker's involvement and intend to exclude him.   603 So. 2d at 40.  Defendant emphasizes that, when asked in January 2018, Buyer told K. Denison that he was not working with any broker, including, specifically, Plaintiff.  (DE 101 at p. 3; DE 102 at ¶¶55-57).  This fact is similar to the seller's testimony in *Lee Giusti* and could be used to suggest that Defendant was unaware of, and therefore did not intentional exclude, Plaintiff.  However, significantly, this conversation only occurred after Buyer had agreed to purchase the Invader and Plaintiff had stepped forward to demand its commission.  If Defendant asked Buyer about broker involvement when Buyer first reached out in November 2017, that fact is not reflected in the record.  Furthermore, unlike in *Lee Guisti*, Defendant was put on at least some notice (accurate or not) that Buyer was working with a broker by Plaintiff's October 5, 2017, email.  A jury could draw the inference that Defendant was aware of Plaintiff's potential involvement but chose to remain blind.  A jury could also choose to take a jaundiced view of the communications between Buyer and Defendant in January 2018 after Plaintiff had come forward to potentially complicate their agreed-upon sale.

17